IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **CONTINENTAL CARBONIC PRODUCTS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**TATE & LYLE INGREDIENTS AMERICAS LLC**<br>Defendant. | Case No.<br><br><br><br><br><br>**INJUNCTIVE RELIEF REQUESTED** |

**COMPLAINT FOR INTERIM INJUNCTIVE RELIEF
PENDING ARBITRATION**

Plaintiff, Continental Carbonic Products, Inc. ("CCPI") by and for its Complaint seeking interim injunctive relief against Tate & Lyle Ingredients Americas LLC ("T&L," and collectively with CCPI, the "Parties") pending arbitration between the parties, and alleges as follows:

**COMMON ALLEGATIONS**

**JURISDICTION AND VENUE**

1.  The Court has jurisdiction over this matter pursuant to 28. U.S.C. §1332(a) in that, as alleged below, CCPI on the one hand, and T&L on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a), in that Defendant T&L has its principal place of business in Decatur, Illinois.

3.  CCPI is expressly entitled to seek and obtain injunctive relief from this Court in aid of the arbitration it is contemporaneously commencing against T&L (the "Arbitration") before the American Arbitration Association ("AAA"). Rule 38(h) of the AAA Commercial Rules of Arbitration provides that a "request for interim measures [injunctive relief] addressed by a party

1

to a judicial authority shall not be deemed incompatible with this rule, the agreement to arbitrate or a waiver of the right to arbitrate." CCPI pursues this action solely for interim relief to ensure that the arbitration which will ultimately resolve this dispute can afford full relief to CCPI by preserving the status quo ante.

## PARTIES

4. CCPI is an Illinois corporation with its principal place of business in Irving, Texas.

5. CCPI is engaged in the business of, among other things, manufacturing, selling, and distributing dry ice, a product derived from liquid carbon dioxide ("$CO_2$").

6. T&L is, on information and belief, a Delaware limited liability company whose sole member is itself an LLC.[1] The sole member of that member LLC is Tate & Lyle Holdings Americas Limited, a private limited company registered in England and Wales with its principal place of business in the United Kingdom and is therefore a citizen of the United Kingdom for diversity purposes.

7. T&L is, on information and belief, the successor in interest to A.E. Staley Manufacturing Company. Where relevant, references herein to T&L shall include A.E. Staley Manufacturing Company, to whose interests it has succeeded.

8. T&L has its principal place of business in Decatur, Illinois.

9. T&L is, on information and belief, engaged in the business of, among other things, manufacturing sweeteners (including sucralose, the main ingredient in SPLENDA®), acidulants, and commodities (*e.g.*, corn gluten feed and meal and corn oil). The company also provides industrial starches to the paper and packaging industries.

---

[1] Defendant Tate & Lyle Ingredients Americas LLC is a Delaware limited liability company with one member; Staley Holdings LLC, which is a Delaware limited liability company which also has one member; Tate & Lyle Holdings Americas Limited, a private limited company under UK law with a shareholder, not a member, and is registered in England and Wales with its principal place of business in the United Kingdom.

10. T&L has a number of manufacturing facilities in the U.S., including a manufacturing facility in Loudon, Tennessee ("T&L Loudon"). One of the by-products of the manufacturing process used at T&L Loudon is CO2.

## BACKGROUND

11. On or about August 20, 2001, CCPI and T&L entered into a CO2 Purchase and Sale Agreement (the "CO2 Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

12. Pursuant to the CO2 Agreement, CCPI agreed to purchase from T&L, and T&L agreed to sell to CCPI, CO2 created as a result of the manufacturing processes at T&L Loudon.

13. In connection with the CO2 Agreement and as part of an integrated transaction, T&L and CCPI entered into a Ground Lease between T&L, as landlord, and CCPI, as tenant, for certain unimproved property in Loudon, TN adjacent to T&L Loudon, the term of which is coterminous with the CO2 Agreement (the "Ground Lease"). A true and correct copy of the Ground Lease is attached hereto as **Exhibit B**.

14. It was the intent of the Parties, in entering into the Ground Lease, that CCPI would construct its own facility to manufacture dry ice from the CO2 it was purchasing from T&L under the CO2 Agreement (the "CCPI Plant"). Because the CCPI Plant had not yet been built at the time the Parties executed the CO2 Agreement and the Ground Lease, the CO2 Agreement provided that the first "Contract Year" of the initial 10-year term during which CCPI would purchase CO2 from T&L would be:

> the twelve (12) month period beginning on the earlier of (i) the first day of the calendar month following the calendar month during which the CCPI CO2 Plant has produced at least 225 tons per day of Liquid CO2 for 5 consecutive days or (ii) one year from [August 20, 2001], the date of execution of [the CO2 Agreement], and every year thereafter for succeeding periods of twelve months.

Exhibit A at ¶ 1(c).

15. Following the execution of the CO2 Agreement and the Ground Lease, CCPI constructed the CCPI Plant, and, the CCPI Plant began operations.

16. The term of the Agreement was to conclude on the "first day of the Eleventh Contract Year," in other words, after the conclusion of ten "Contract Years as defined in ¶ 1(c)." Exhibit A at ¶ 3.

17. The CO2 Agreement further provided that "CCPI shall have the option to extend the term of [the CO2 Agreement] for two successive five year terms by giving written notice of its election to do so, not less than one-hundred-eighty days prior to the expiration of the prior term." Exhibit A at ¶ 3, as amended by Amendment 3 to the CO2 Agreement dated September 20, 2013 at ¶ 1, a true and correct copy of which is attached hereto as **Exhibit C**.

18. At no time between August 20, 2001 and August 20, 2002 did the CCPI Plant produce at least 225 tons per day of Liquid CO2 for 5 consecutive days.

19. The first Contract Year of the CO2 Agreement did not, therefore, commence until August 20, 2002, and, according to its terms, would not conclude until August 19, 2012. Exhibit A at ¶¶ 1(c), 3.

20. The CO2 Agreement further provided that "CCPI shall have one year after termination, cancellation, or expiration of [the CO2 Agreement] to remove at CCPI's sole expense the [CCPI Plant] (excluding pilings, foundations, or similar in-ground installations) from the [CCPI Plant] site." Exhibit A at ¶ 2.

21. On December 14, 2011, more than 180 days before the expiration of the initial term of the CO2 Agreement, CCPI gave written notice of its election "to extend the agreement for another five (5) year period to August 20, 2017." A true and correct copy of that written notice is attached hereto as **Exhibit D**.

22. On December 7, 2016, more than 180 days before the expiration of the first extended term of the CO2 Agreement, CCPI gave written notice of its election "to extend the agreement for another five (5) year period to August 20, 2022." A true and correct copy of that written notice is attached hereto as **Exhibit E**.

23. Thus, as of the December 7, 2016 extension, the CO2 Agreement was set to expire no earlier than August 20, 2022.

24. T&L neither objected to nor attempted to correct either of the notices of extensions reflected in Exhibits D and E, and it has continued to sell CO2 to CCPI through the date of this filing.

25. At some point prior to July 12, 2021, the Parties discussed the prospect of CCPI assigning to T&L certain tax credits available for carbon oxide sequestration pursuant to 26 C.F.R. § 1.45Q-1, *et seq.*, commonly known as "45Q tax credits."

26. T&L and CCPI subsequently entered into a Fourth Amendment to the CO2 Agreement dated July 12, 2021 titled "Fourth Amendment to Raw Carbon Dioxide Purchase and Sale Agreement (45Q Tax Credit)," the principal purpose of which was to document the assignment by CCPI to T&L of such 45Q tax credits. A true and correct copy of the Fourth Amendment to the CO2 Agreement is attached hereto as **Exhibit F**.

27. In doing so, the Fourth Amendment incorrectly recited in the first WHEREAS clause and as a premise to that Fourth Amendment, that the CO2 Agreement had been previously "extended" to August 20, 2021, rather than the actual and correct concluding date established by the December 7, 2016 extension of August 20, 2022. *See* Exhibit F, first "WHEREAS" clause.

28. The incorrect concluding date recited in the first WHEREAS clause of the Fourth Amendment was also reflected in paragraph 2 of that amendment, which purported to "extend" the

CO2 Agreement from August 20, 2021 to December 15, 2021. As alleged above, the concluding date was August 20, *2022*, not August 20, *2021*. Changing the concluding date to December 15, 2021 would not be an "extension" at all, but rather would shorten the term of the CO2 Agreement by almost nine months.

29. In entering into the Fourth Amendment to the CO2 Agreement, the Parties intended to "extend," not shorten, the term of the CO2 Agreement.

30. At no point before or after entering into the Fourth Amendment to the CO2 Agreement did CCPI ever have the understanding or intent that the CO2 Agreement would terminate sooner than its properly extended concluding date. It did not intend under any circumstance to shorten the term by almost nine months.

31. On November 9, 2021, T&L notified CCPI of its intent to "stop CO2 gas flow to [the CCPI Plant]…when the Agreement terminates on December 15, 2021." A true and correct copy of that letter is attached hereto as **Exhibit G**.

32. Two days later, on November 11, 2021, CCPI, now understanding the Fourth Amendment misstated the concluding date of the CO2 Agreement, responded by pointing out that the first WHEREAS clause and the purported "extension" provided for in paragraph 2 of the Fourth Amendment each were based on the mistaken premise that the CO2 Agreement concluded on August 20, 2021, when in fact the CO2 Agreement would not conclude until August 20, 2022. CCPI went on to seek T&L's acknowledgement that the Fourth Amendment was based on a scrivener's error or mistaken premise and that T&L would continue to perform its obligations under the CO2 Agreement until its actual conclusion on August 20, 2022. A true and correct copy of that letter is attached hereto and made a part hereof as **Exhibit H**.

33. Despite being provided the correct concluding date, on November 22, 2021 T&L informed CCPI that it did not acknowledge the correct termination date of August 20, 2022 and persisted in its position that the CO2 Agreement would conclude pursuant to the Fourth Amendment on December 15, 2021. T&L ended the communication by stating, "[f]or the avoidance of any doubt, [T&L] will cease gas flow upon termination of the Agreement on December 15, 2021." A true and correct copy of the November 22, 2021 letter is attached hereto and made a part hereof as **Exhibit I**.

34. Through its written correspondence and other communications with CCPI, T&L has clearly and unequivocally indicated that it does not intend to perform its obligations under the CO2 Agreement after December 15, 2021.

35. As a result, and pursuant to paragraph 17 of the CO2 Agreement, CCPI has, contemporaneously with the filing of this action, filed and served its Demand for Arbitration with the Chicago, Illinois office of the AAA seeking, among other things, reformation of the Fourth Amendment and specific performance of the CO2 Agreement simultaneously with filing the present lawsuit to maintain the status quo.

36. While ultimate adjudication of the Parties' dispute arising under the CO2 Agreement will occur in the Arbitration, if T&L is not enjoined from ceasing the sale of CO2 gas on December 15, 2021, CCPI has no commercially feasible way of replacing it, 225 tons of which would need to be trucked into the CCPI Plant every day. Even assuming that volume of product is available, transporting it to the CCPI Plant presents a daunting shipping challenge under present

market conditions, and CCPI will suffer irreparable harm before an arbitrator is appointed who can take up the matter and provide CCPI relief.[2]

37. Furthermore, once the CO2 Agreement concludes, CCPI has one year to remove its machinery and equipment from the CCPI Plant (which has material value), a costly and time-consuming process that will make it impossible for CCPI to continue to manufacture dry ice at that facility. *See* Exhibit A at ¶ 2.

38. If CCPI fails to remove its machinery and equipment following the conclusion of the CO2 Agreement, it runs the risk of T&L claiming that its machinery and equipment has reverted to T&L as landlord pursuant to the Ground Lease.

39. If no temporary restraining order or preliminary injunction is entered preserving the status quo, it will be impossible for this Court, or an arbitrator as contemplated by paragraph 17 of the CO2 Agreement, to later provide full and adequate relief to CCPI due to the irreversible dismantling of the machinery and equipment that allows the CCPI Plant to operate, even if it is later determined that CCPI's right to purchase CO2 under the CO2 Agreement should not have concluded until August 20, 2022. Nor will the remedy of cover be adequate. Even if it is theoretically possible to purchase 225 tons of liquified CO2 from third parties and transport it to the CCPI Plant every day given current market and transportation challenges, cover is meaningless without machinery and equipment at the CCPI Plant with which to process the CO2.

---

[2] Since the CO2 Agreement was executed prior to October 1, 2013 but extended and reaffirmed thereafter, it is unclear whether Rule 38 of the AAA's Commercial Arbitration Rules, which was made effective October 1, 2013 and which provides for emergency measures of protection, applies to the present dispute.

## COUNT I

### INJUNCTIVE RELIEF BASED UPON MUTUAL MISTAKE

40. CCPI repeats and realleges paragraphs 1-39 as this Paragraph 40 as if fully set forth herein.

41. At no point before or after entering into the Fourth Amendment did either party ever intend or agree that the CO2 Agreement would terminate earlier than the term provided for in the CO2 Agreement and its extensions.

42. Assuming that T&L did not intentionally mislead CCPI and was unaware that the concluding date was incorrectly reflected in the Fourth Amendment, the incorrect concluding and extension dates in the Fourth Amendment reflect a mutual mistake of the Parties.

43. CCPI never would have entered into the Fourth Amendment had it been aware that it contained an incorrect concluding date for the CO2 Agreement (August 20, 2021) that purports to shorten, rather than extend the CO2 Agreement.

44. CCPI never would have entered into the Fourth Amendment had it been aware that it contained an incorrect extension date for the CO2 Agreement (December 15, 2021) that purports to shorten, rather than extend the CO2 Agreement.

45. As a direct and proximate result of the mutual mistake regarding the concluding date of the CO2 Agreement and its purported "extension" of that concluding date, the Fourth Amendment does not reflect the Parties' prior agreement regarding the term of the CO2 Agreement or their intent regarding its extension.

46. Accordingly, CCPI is entitled to reformation of the Fourth Amendment to strike the "August 20, 2021" date contained in the first WHEREAS clause and replace it with "August 20, 2022," and to delete the second paragraph in its entirety.

**COUNT II**

**INJUNCTIVE RELIEF BASED UPON FAILURE AND/OR LACK OF CONSIDERATION**

47. CCPI repeats and realleges paragraphs 1-39 as this Paragraph 47 as if fully set forth herein

48. As recited in the Fourth Amendment, consideration for the entry of that amendment was based upon the "foregoing premises," including the mistaken concluding date of the CO2 Agreement, as well as the "mutual promises set forth below," including Paragraph 2, purporting to extend the term of the CO2 Agreement to December 15, 2021. See Fourth Amendment at "THEREFORE" clause.

49. The sole promises in the Fourth Amendment providing consideration to either party were found in Paragraph 1, which solely benefitted T&L in providing it with four years of valuable 45Q tax credits, which were retroactive to 2018, and Paragraph 2, which purported to benefit CCPI by "extending" the term of the CO2 Agreement to December 15, 2021.

50. The "foregoing premise" of the Fourth Amendment regarding the concluding date of the CO2 Agreement incorrectly stated that date to be August 20, 2021, one year earlier than the correct concluding date of August 20, 2022. See Fourth Amendment, first "WHEREAS" clause.

51. The sole consideration to CCPI in the Fourth Amendment, the purported "extension" of the concluding date to December 15, 2021, was in fact no extension at all, but was instead a shortening of the term of the CO2 Agreement by almost nine months, and therefore a detriment rather than lawful and sufficient consideration.

52. As a result of the foregoing, CCPI received no consideration at all for the assignment and transfer of four years of valuable 45Q Tax Credits to T&L, and there has been a

failure of consideration necessary to support the viability and enforceability of the Fourth Amendment.

53.     The Fourth Amendment is, as a consequence of the failure and lack of consideration flowing to CCPI, a legal nullity and unenforceable in its entirety, including the purported transfer and assignment of four years of 45Q Tax Credits and the purported "extension" of the CO2 Agreement, which in fact would have the actual effect of shortening it by almost nine months, and be a detriment, and not consideration, to CCPI.

## PRAYER FOR RELIEF

WHEREFORE, Continental Carbonic Products, Inc. respectfully prays that this Court enter interim relief in its favor and against Tate & Lyle Ingredients Americas LLC for the following elements of relief

A. Entering an injunction maintaining the status quo between the Parties related to the continuing operation and effect of the CO2 Agreement and Ground Lease, as well as ownership by CCPI of the 45Q credits from April 1, 2018 forward, until the claims in the Arbitration may be decided; and

B. Granting CCPI such other and further relief as the Court deems necessary or appropriate.

Dated: December 7, 2021                                                Continental Carbonic Products, Inc.

By: /s/ Paul T. Fox
One of Its Attorneys

Paul T. Fox (Atty No. 3121741)
Jason B. Elster (Atty No. 6289434)
Scott Dorsett (Atty No. 6329623)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100

T: (312) 456-8400
F: (312) 456-8435
foxt@gtlaw.com
elsterj@gtlaw.com
dorsetts@gtlaw.com